Good morning, your honors. R.J. Zaid on behalf of Altraz Black. With me, sitting at council table, is Kristen Zinsmaster. She's part of the Federal Defender of Criminal Justice Act program, mentor-mentee program, and she's been with me since the arraignment and has worked closely with me on this matter. There's two issues that I'd like to address with the court today. The remainder of the issues, your honor, we rest on our briefs and our arguments and the cases cited there. The two issues I'd like to focus on today, your honor, is whether the district court abused its discretion in denying our motion for mistrial because it admitted over our repeated objections, evidence that had zero relevance or marginal relevance with respect to the crimes charged. It was admitted for the purposes of background and context, your honors. But if you would look, the easiest way to show that is if you look at the appellee's addendum, A2. A2 has a list of six murders and seven shootings. Of those six murders and seven shootings, only one of them was relevant, and that was the murder of Mr. Black's brother, which was part of our defense as to why Mr. Black carried a firearm. But there are five other murders that had no business being in this case. Why is not some of this information relevant to explain the motive for the conspiracy for why this particular group of people felt that they needed to, well, basically conspire to possess firearms? I grant you that some may have been law, but the court allowed the government to steamroll us with violent murders, one murder after another. So where's the line that we draw? Where do you say it went over the line into prejudicial evidence as opposed to setting the stage for motive? That's a great question. Your honor, I would look at Looking Cloud, and I would look at the case that the government filed yesterday afternoon after hours at 5 o'clock, Payne Owens. In Looking Cloud, in that case, the references, it was a- Did we decide a case yesterday at 5 o'clock? Pardon? Did we decide a case yesterday at 5 o'clock? No, the case was decided back in January. However, the government didn't file it until after closing hours yesterday. Well, sorry to interrupt. No, thank you, your honor. But going back, if you look at Looking Cloud, the Looking Cloud court said that under certain circumstances, it comes in. In that case, it involved a defendant who was charged with murder of an American Indian movement. He was a member of the American Indian movement. He was accused of murdering a victim who was a member of the American Indian movement. He was accused of murdering the victim at the behest of the leadership of the American Indian movement. So in that case, the context of court said, I'll allow it because it shows the connection between the parties. The court also allowed very limited information about the American Indian movement in general. And that was through one witness and in passing. And that witness was allowed to testify about Custer and the riot at Custer involving over 100 people. It was allowed to testify about the 71-day siege at Wounded Knee. And he was allowed to testify about the shootout involving the FBI and which two FBI agents. But that was fleeting in passing. Looking Cloud said that that case, that there was not a pervasive theme. In this case, Your Honor, murder, mayhem, shootings, and death were pervasive. This was offered and presented in the opening statement. Maybe just to focus even more nearly, in this case, as I sort of looked at the transcript, you objected to all of the evidence. But now I sort of hear your argument on appeal that some of it might have been admissible for proper purposes in the government's case. Where do they need to stop? And did you present that to the district court as an alternative? Well, first of all, Your Honor, in terms of presenting it to the district court, I'm looking to see if I could, where it should have stopped. If you go to A1 of the Eppolese Addendum, that's where it should have stopped. There, it talks about the traffic stops that case in this issue. And they could have then said this was in relationship to involving a gang war. There was a gang war that was going on between the leader of the 1-9, was Valtrez Black's brother, who was murdered. He was associated with the 1-9 and with the Sticker Boys. They were in a gang war with the Taliban and the young and thugging. That was the battle. Counsel, you say this came in the opening statement. Describe how this trial went. Was the opening statement applicable to all four defendants, or was it simply an opening statement as to Mr. Black? Mr. Black is the only one who went to trial, Your Honor. The trial was limited to us, and yet the litany and the parade of horribles began an opening. Now, the government tells you that it was isolated and it was bland statements. Yet, on our brief from pages 22 to 25, we list out eight separate witnesses who testified about the shootings and the murders in the case. For example, when Kibbe Walker was testifying, Kibbe Walker was a member of the Taliban cooperating with the government in the suspected murder of Valtrez Black's brother. He testified. During his direct, the government walks him through the murder of Derek Martin, and it says more or less an ambush. The government then brings on another police officer with respect to a shooting involving Mr. Blunt, and he says he was shot in the head, and he sustained a brain injury and loss of an eye. Then we have repeated shootings of homes where people are involved in. Now, the problem, Your Honor— What objection was made to the district attorney? Your Honor, we objected before trial. We filed a comprehensive motion in limine seeking to exclude all this evidence. We had a hearing before the district court before trial. The district court summarily denied all our motions and said it was allowed in for purposes of background and context. And during trial, we repeated our objections, but they were denied. Now, going back to your point, Judge Kelly, with respect to where do we draw the line, Payne's Owens, which is the case that was just cited yesterday, also gives you guidance as to how far to go. In Payne's Owens, the defendant said, hey, there's a posting of the defendant, and the posting of the defendant with a gun and ammo. The defendant said it's not real. This is not real. The court said specifically, I'm going to allow evidence of gang information for the sole purpose of you jury determining whether this gun is real and the ammo is real, and for his motivations to own a real gun. That's the only purpose you can use it for, and you can't use it for anything else. That gives guidance as to how far this court could have gone. Was there a jury? As I looked at the jury instructions, there was none provided to the jury about how to use this testimony or this evidence, or was there instruction during the course of the trial? No, there was no instruction during the course of the trial. The judge ordered in the motions in limine that he was going to allow the evidence in at that point. Without limitations? Without limitations. Did you ask for a limiting instruction? There is no way, Your Honor, that a limiting instruction would have worked involving five murders and seven shootings. To answer your question, no, Your Honor. Okay. But going on, the point is that looking at Cloud, their case, it says if it's a pervasive theme, that's a problem, and that was a problem here. And same with looking at Cloud, pervasive, and it also talked about the gang membership served as a substitute to link the evidence to the crimes charged and encouraged the jury to find guilt by association. This whole case was built on association. Be fearful of this man, and I believe we were denied fair trial. I want to focus very quickly on the sufficiency of the evidence. I think this case, the sufficiency of the evidence, there's a gun found during a chase. This gun that's found during the chase, there's no connection to the car that was involved in the chase. The chase involved, they were seeking to arrest Mr. Black. He was a passenger in a car. The car did not belong to him. It wasn't registered to him. There was a chase. Nobody saw anything thrown out. Nobody saw any doors being opened. Was there a time when the car was out of view? Briefly for about three seconds, Your Honor. Three seconds? According to whom? Well, if you look, there's a video cam. Oh, so the video would show this. Yes, the video show will give the exact timing. Now, nobody saw a gun being thrown out, but more importantly, even if there's a connection between the gun and the car, there's no connection to Mr. Valtrez Black. And this Court's ruling in Ramos is very instructive. Because in Ramos, the Court held that because Ramos jointly occupied the apartment with Schmidt, the government was required to prove some evidence linking him to the gun beyond the dominion over the apartment. That same applies here. When you have two people in a car, even if you give them, say, even if you accept the connection that this gun is connected to the car, who threw the gun? Was there evidence of that also, that the gun had come from the car? No. Nobody saw it, Your Honor. Nobody saw it. The government's whole theory on the gun is this gun was found along the path, and the people did not see the gun beforehand. Therefore, it had to have come from the car. But that's flawed because if you look at the poll cam, if you look at the poll cam, which is an exhibit that was offered, I think, Government Exhibit 24, the poll cam video from 40 seconds to a minute 35 shows the people standing around. The car goes around the corner. It hits a pickup truck. The owner of the pickup truck comes out and looks at the car. A golf cart guy goes by and looks at the car. The gun is less than 20 feet away from it, according to the testimony, yet neither one of them saw it. Two other cars go by. They didn't see it. The maintenance man who eventually found the gun drove right past it and didn't see it and came back. So there's a reasonable doubt that the gun came out of the car, and there's a reasonable doubt that Mr. Veltraz Black knowingly possessed that gun when there were two of them in the car and nobody saw that. I'd like to reserve my last minute, if I may. You may certainly. Thank you, Your Honors. Mr. Ng? May it please the Court, Paul Ng on behalf of Tywin Bender. He appeals the sentencing on his combined cases and also the jury instruction issue on his trial. The question for today is one that was left unanswered by the Supreme Court a couple years ago in Elonis, and that question is whether or not a criminal defendant has a First Amendment defense to a retaliation charge where the communication is an email, arguably protected, sent in such a way that it might not ever be delivered to the recipient. And if there is a defense under the First Amendment, which I urge you to accept that there is, then what are the jury instructions to be given? That was the key issue in Mr. Bender's trial, and let me put it in the context of the facts, if I may. The two witnesses testified at Mr. Zaid's trial for Mr. Black, Kibby Walker, and a guy named Louis, Antonio Louis. It was a public trial downstairs, apparently well attended by gang members. This was a big gang case in Minneapolis when it came down. It was an attempt by the government to take out two or three significant gangs in North Minneapolis. These two individuals testified in sort of a generic sense. They didn't implicate Mr. Black directly, but they did testify about various gang membership proceedings, gang warfare, gang shootings, and so forth. And Mr. Bender was in prison, heard about this, and the testimony was that everybody in prison hears about testimony, or at least could hear about the testimony in this case. He contacted his then-girlfriend, whom he met on the Internet. This is very much about the Internet, this case is, and asked her to write an email. She didn't know anybody. She wasn't in a gang. She was acquitted, I think, for those reasons, rather naive. And he had her send this email, which is reprinted in both our briefs. And the email was sent to Rush City to two gang members named Gomez and White, and it instructed them to smash Mr. Walker and Mr. Louis. And the testimony was that all emails are intercepted before ever being delivered. The inmates know this. Everybody knows this. And one of the emails was indeed intercepted, and one apparently got through. But the email was delivered long after the conspiracy was over. During the course of this trial, in defending Mr. Bender, I was looking at First Amendment law, which is a ripe area in the Supreme Court, at this juncture, and there was the Alonis case coming up. It had been decided. And then there was Snyder and some other, and there was Citizens United. And the First Amendment is one of those key areas that's evolving in the Supreme Court, it seems to me, in my reading of it. And we read with interest Alonis, which in the first paragraph recognized there may exist a First Amendment defense. Was the First Amendment objection made? Yes. Yes, and four instructions were submitted. I was trying to get Judge Kyle to give one. You know, you hope for one out of the four, but you hope for something. And the First Amendment law is that. Why is it relevant here if he wasn't charged with threatening anybody? Well, the threat is in the form of a speech. The threat is in the communication. The threat is not putting a gun to your head and saying, I'm going to get you. Or the threat isn't putting a knife to your head. The threat is an ethereal speech. And the First Amendment law gives Mr. Bender some distinctions that help him. And one of the distinctions is that the threat has to be actual instead of unmeant or ethereal. And as I read Alonis. You mean if he's charged with making an unlawful threat, it has to be a true threat. Yes, but how does that fit in a retaliation case? Well, if the retaliation is in the form of a threat, which is what this is, it's a threat that is supposed to be actualized. I realize there are two different statutes, but it's the same idea. If Alonis, for example, Mr. Alonis had been charged with retaliating against a witness to what his wife had she testified against him, he could have raised the same defense. I really didn't mean to say what I said on Facebook. I didn't really mean that I was going to put a knife to her neck, which is what he said on Facebook. I didn't really mean to say anything. I was just venting. He could have used the exact same defense. Well, you could argue that here. My guy didn't intend to retaliate. He was just doing something else. And I certainly did argue it because I argued, well, it never got there. He knew that it wasn't going to get there. They were going to review it, and therefore he really didn't mean it. But it's one thing to argue. It's quite another to get a jury instruction that gives the jury some kind of guidance on how to evaluate the First Amendment claim that I have. I mean, in a murder case, for example, if your defense is self-defense and the court doesn't give self-defense, you're left with arguing, well, I didn't intend to kill him. But if you're given your defense, then you have a different kind of argument and there's a different instruction. I'm sorry. Go ahead. I never interrupted you. No, go. Finish your argument. Similarly, if your defense, if our defense, Mr. Bender's defense, is First Amendment, should he not receive some kind of instruction from the court to the jury as to how they should evaluate that claim? I mean, that's the whole point of what he was trying to do here. The facts are almost conceded. There was cross-examination on what they meant and so forth, but it was a two-day trial, essentially. But there is a mens rea in this, right? That's correct. And so it's not looking at what the subjective view of the folks in the prison would have thought. It's based on your client's own actions, correct? Correct. And there are certain categories that just don't fall within First Amendment protection. I'm struggling to see how, when you've got an intent to actually retaliate, how that can be a free speech defense, how that is the same as a threat. Well, you're asking the same question that Judge Kyle essentially did, and that was his ruling below. The answer to the question is that even if you intend to send a threat, the jury should still be told, it seems to me, the difference between an actual threat and a venting sort of threat. So there's the question of whether he intended to send this message to these folks, but really what he meant in it could be free speech? Well, it could be free speech if he didn't mean that it was an actual threat. He could mean to send the threat, but if it wasn't an actual threat, he didn't mean to send an actual threat. I mean, these are nuances, admittedly, but they're nuances that the case law provides to us. I mean, you can say horrible things about anybody under that Snyder decision. You can make horrible statements during a funeral. You can offend people. What are the descriptions of describing what somebody is or is different than inciting someone else to do them harm and, in essence, requesting that someone else do them harm? Well, the issue is whether he could utter these things. I mean, could he divorce ourselves from the case for saying, could he between someone else in prison say, I don't like what happened here, I don't like these guys? That would be different, though, wouldn't it? Send an email that says, I don't like what they did, and express, as Chief Judge Smith says, some derogatory statements about them. But that's different, isn't it, than sending an email to say, and you need to cause harm to these people because I don't like what they did. Well, there may be indeed a difference, but in his case, I mean, he was venting. I mean, in the larger context of the Internet within which we all live, people are saying all sorts of impulsive things now without much thought, and this has been going on for 20 years. Teenagers and texting. That doesn't mean those things shouldn't have consequences. Well, that's true, but the issue is whether they have criminal consequences as opposed to free speech consequences. One may say, well, he certainly could intend to do it by the use of his email. My point is that he raises this defense. It's a valid defense, and it may not have won the case. I think it might have, but, you know, I was there, and you live these things. But if it's a valid defense, does not he get an instruction? So we're doing the cart and horse, saying, well, of course, maybe he intended it, but on the other hand, does he get a defense? Did I make enough of a record through cross-examination and arguments to create a First Amendment defense in the law? I think I did. And if that's the case, should he have given it as consistent with our theory of the case? And he should have. And then it becomes how would we know whether that's harmless or not harmless? But I get the defense. It's a new defense. The Supreme Court has suggested it's available in criminal cases. I'm trying to utilize an area of the law that is not clear but sufficiently clear for our purposes and affords Mr. Bender an excuse, a constitutional excuse, that the government would have to rebut beyond a reasonable doubt. And that's why it's so important. On the one hand, it's an email sent through the prison system, and it contains, by the way, a rap lyric, which is certainly protected speech. I mean, the end, never snitch on blank dry, that's from a famous rap song that he quotes in his email. So that, in hindsight, that's a split issue too. I suppose I could have asked for instruction that the rap lyric was protected speech. I should have done that. But there is a defense available. And one said it would be really a fine decision, and we hope you make it, to recognize the First Amendment defense. It does exist. It existed in Watts. It existed in Cohen. And now in the present-day email world, it should exist now. And if it exists, how is it defined and should not have the jury received instructions on it? I would ask you to reverse his conviction. Thank you. Thank you, Mr. Eng. Mr. Lingaling. Good morning, Your Honors. Robert Lingling on behalf of Jabari Johnson from a Pleas the Court counsel. To start, I think it is important to have a little bit of context here because Mr. Johnson, Your Honor, was the first person in this case to indicate that he would enter a guilty plea. He did not participate in the pretrial motion hearings. He did not go to trial. And it caused him significant fear of what may happen. I think the rumor then began, of course, that Mr. Johnson was some kind of cooperator. He really wasn't, but it did cause him some fear. As you heard here today, this case was a large gang case out of north Minneapolis,  and so it provides a context in the sense that Mr. Johnson moved forward with his plea, the first one to do that, knowing that some of the other people in this case were questioning him. He comes here, or has me here today, Your Honors, to argue that his sentence was unreasonable, and it's improper in two ways. Procedurally, Mr. Johnson argues that the district court judge didn't explain the sentence other than the state, the sort of basic statement that it was sufficient but not greater than necessary to achieve the goals of sentencing. Meanwhile, at the same time, the judge basically brushed aside Mr. Johnson's motions for departure or variance without adequate explanation. Basically just announced the sentence and said to Mr. Johnson in the hearing, you know, I think you have a terrible criminal history. I want to send a message to you. I want you to kind of learn from this and didn't take into account what was going on with Mr. Johnson. Substantively, Mr. Johnson argues that the sentence was unreasonable anyway, because it's 78 months, which is the high end of the guideline range, but also greater than necessary in this case given the fact that he did have valid variance arguments. Ultimately, Your Honors, Mr. Johnson believes that it's unfair and inaccurate to tie his case so closely to Defendant Parker, and that's not to say anything bad about Mr. Parker. It's just that they are very different cases in the sense that Mr. Parker does not have or did not have the same variance arguments that Mr. Johnson had. Why do you say they were tied together? Is it because the district court was trying to give consistent sentences to people who seemed to be involved to a similar degree? It was obvious during the sentencing hearing and really from the government as well that these two defendants were sort of compared to each other often, being similarly situated, and they ended up with the same sentence basically, 78 months. But what Mr. Johnson argues is that while they may be somewhat similarly situated in the sense of where they were in the indictment scheme, Mr. Johnson had assisted the government. He had assisted law enforcement prior to his indictment, and he wanted some credit for that. He did it at peril to his own well-being. Was there some attempt at negotiating a cooperation departure or having a substantial assistance reduction? Not really because he didn't sign on as a cooperator, Your Honor. These are things that had happened prior to him being charged in this case. He'd be arrested. He would help out in some way. For example, and I think it's in the brief, Mr. Johnson had been arrested or was being questioned, and he voluntarily, without an attorney to help him, gave up some information about where some firearms were located. Certainly he was expecting to get some assistance out of that or some help. I think it was his position that the officers had said, well, you know, it's sort of the typical you help us, we'll help you, and so he did that. But he was not negotiating a 5K motion or anything like that. And your view is that the district court just didn't consider that sufficiently? Yes. And was there any concern about talking about that in open court at the time? There was, Your Honor. We filed everything under seal at the time by my client's request. He was concerned that people would hear about his case. You know, he's still concerned about that today. So how do we factor that in in terms of how much the district court said on the record? Well, the judge brought it up on the record, and Mr. Johnson at that point said, hey, you know, we need . . . I mean, I think it was clear that he had done some things to help himself early on in the case. But he was not . . . he didn't appear as a witness for the government or anything like that. So I told him, I think it's better that you just simply let the court know exactly what was happening. So despite filing things under brief, we ended up speaking on the record about this. The other issue here, Your Honor, was his medical condition. What authority do you cite for that being a substantial factor for the court to take into account in sentencing? We just argued it under whether or not it was a reasonable sentence. And whether or not the court had considered that as, you know, when going through the 3553A factors. That's really the argument here. I don't have a case that says you must consider assistance outside of a 5K motion. But, Your Honor, as I say, I'm out of time here. I don't want to take any from my colleague.  Thank you, Mr. Lindland. Mr. Goetz? May it please the Court, Counsel. My name is Frederick Goetz. I represent Daryl Parker. Mr. Parker's issue today is he contends that his sentence of 78 months was unreasonable as it was greater than necessary to accomplish the goals of sentencing under 3553A. The parties don't dispute the law. We don't dispute the facts. We've thoroughly briefed it. The Court has heard many arguments already. I don't have anything further to add beyond the briefs. If the Court has any questions on Mr. Parker's issue, I can address them. So your argument is there's no argument that there was any procedural error on the part of the Court? No. It's strictly the substantive reason. Hearing no questions, thank you. Okay. Madam Clerk, did Mr. Zaid have a little time left, or did he exhaust it? Or should we hear from the government first? I'm getting used to this. Government, we do need to hear from you. That's a good sign. We definitely need to hear from you. Well, let me start with the evidence of the murders and the shootings. Judge Kelly, you hit it right on the head. It did go to the motive. This was litigated pretrial. But why so much? There wasn't that much. Put it in context in terms of the time of the trial and time committed to the use of this type of evidence. What you see on that little one-page synopsis is pretty much what the jury heard. We covered all those murders and shootings primarily with one witness, Kibbe Walker. And if you read Kibbe Walker's testimony, I took him through that in maybe 20 pages of testimony. Antonio Lewis, another cooperator, added a little bit to it. But he was in jail a lot of the time, so he wasn't around for a lot of the murders. Kibbe Walker was part of a lot of them, and he knew about them. 20, maybe 30 pages of testimony. My closing argument, summarizing the violent crime evidence. Literally, literally two paragraphs out of probably a 45, 50-minute closing argument. Was there a cautionary instruction? Well, none was requested by the defense. But I gave one. I gave one in my opening statement. It's quoted at page 26 of our brief. But I told the jury right up front that this indictment does not accuse Mr. Black of having murdered anybody or having shot anybody. But it accuses him of being a member of a gang that was involved in a gang war. I went on to say, so you're going to hear about this gang war as kind of a context and background that might help you decide what the people's motivation was for possessing these guns. And in closing argument, after those two paragraphs about summarizing the violent crimes, I went out on my way to tell the jury, Mr. Black is not being accused of any of those violent crimes. And the witnesses we brought in did not accuse Mr. Black of those violent crimes. What is the relevance? It goes to the motive for possessing guns. And that had been litigated prior to trial, and the district court had ruled that the evidence was relevant because it goes to the motive for these people conspiring to possess firearms. You identified two witnesses, Mr. Walker and another cooperator. Weren't there some other witnesses who also testified to some of the information that's on the piece of paper we're looking at? Mr. Zaid mentioned one witness who I think was the one who investigated the shooting of Mr. Johnson. Mr. Johnson had been shot at a gas station just prior to our indictment. In fact, that's the reason we had to accelerate the indictment is because he'd just been shot by rival gang members, and we knew that the retaliation was just about to occur, so we accelerated the indictment. There was some brief testimony on that, maybe a page or two, about how Mr. Johnson had been shot. No insinuation that Mr. Black had done it. Of course, he wouldn't have done it. That was one of his fellow gang members, but it was another battle. So no other witnesses testified about the shootings or the murders? We had to have some people come in and talk about bullet casings that matched casings left at crime scenes. We had one fellow at the end who talked about casings recovered behind Mr. Black's house, but the primary evidence about the shootings was from Kibbe Walker, and that was very, very limited, and I gave a cautionary instruction both in opening and statement and closing about how that evidence could and could not be used. Was the evidence that all four of these defendants, or I guess the other three who didn't go to trial, were they mentioned in the trial as conspirators? Yes. Was the evidence that they were all members of the same gang, street gang? Yes. Well, the two associated street gangs, the One-Nine and the Stick-Up Boys. So we had a gang expert talk about that. I should mention, too, that the judge did, even though one was not requested, the judge did give a cautionary instruction at page 1001 of the transcript which said Mr. Black is not on trial for any act not alleged in the indictment, and so that was why I reiterated in closing that we were not accusing him of any of these violent crimes or murders. Counsel, I'd like to talk about the possession charge. Yes. What is there beyond speculation that Black actually possessed a firearm? Well, it isn't based on speculation at all. You start with Black's own... Well, give me the facts. Okay. The first thing we proved up was as early as 2010, Mr. Black, in a prison letter, said that as soon as he gets out, he's going to be carrying a gun at all times. And that letter was before the jury. I'm going to be carrying... That doesn't prove he had a gun when he was arrested. Not by itself. And so then we go on. The jury heard before we get to this final transaction that is count two. The jury heard along the way two other times where Black was caught in a car in possession of guns. They learned that in at least one of those incidents he had already pled guilty and admitted he possessed guns. The jury also knew that he had been caught at a gang hangout with several other gang members. So far you've only proved possession at other times. Well, you want to... I'm listening. I'm listening. So this is the background that they knew, that he had pled guilty to possessing guns in connection with other gang members in that incident. So that's all background. It was intrinsic evidence, but it could have been treated as 404B. So now we get to the case at hand. It wasn't a question of speculation. The police officers tried to pull Mr. Black... What are the facts that lead to a reasonable inference that he possessed firearms? Mr. Black had a warrant. The police pulled him over. He's in a car being driven by a fellow gang member. He's the passenger, the only passenger. As they pull him over, and you can see this on the squad video, and both officers testified, as they first pull him over, both officers see Mr. Black with his hands down... Defertive movements. As if trying to hide something or manipulate something. The driver is not doing anything of the kind. Then the car speeds off. There's a high-speed chase. It lasts about 20 seconds. And for three seconds, as the car makes a left turn, hitting another car in the process, it's out of view of the squad video. But the gun is found right where that left turn was made. It was on the passenger side of the vehicle. It would have been virtually physically impossible for the driver to have thrown it out because it would have had to go out the driver's side. The gun's found on the passenger side. All through trial, the defense argument was the driver had the gun. The driver threw it out. We showed that that wasn't physically possible. So for the first time in closing, they changed the argument to, well, the gun must have been there all along. It was never in the car. The problem with that argument was that we had witnesses, two of them, who had been there prior to the car going by, had been doing work there at the apartment complex. They had not seen a gun that day. They both said that they've never seen a gun lying out in the open at any time when they've worked at that apartment complex. The gun had asphalt embedded in the slide of the gun, which showed that it had been thrown from a moving vehicle as opposed to somebody just coming up and laying it down gently, which why would anybody do that? And it was right where the car had gone by moments earlier. So the standard of review on appeal is all reasonable inferences must be afforded to the government. You can only reverse if no reasonable jury would have convicted under this set of facts. And I submit to you, when you have Mr. Black saying, I'm going to carry a gun at all times, he proved over the years he did carry a gun at all times, and he was the passenger in this vehicle making furtive movements, and he fled from the police, it's more than a reasonable inference that he possessed the gun that day. Were there any witnesses during those three seconds that the car is out of the sight of the officers? Is there anybody who could have seen a door or a window open, or was the car window open when they were pulled over? I'm glad you brought that up because I forgot to mention that at the moment the car makes that left turn and hits the oncoming vehicle, we called the driver of that vehicle who got hit. And he said, I saw the guy coming right at me, so I was watching the driver, and the driver had his hands gripped on the wheel. He had no gun in his hands. I didn't really pay any attention to the passenger. I didn't see what he was doing, but the driver had his hands gripped on the wheel, so the driver could not have been the one that threw the gun out. So that's the only witness that you had that could have seen what was going on when the car sort of stopped at that turn. Is that right? Yeah, the officers couldn't see exactly at that moment. But there aren't any other people around, is that correct? Is that what the evidence showed, that there was just the one person who would have been a witness to that? And he did not testify to a door opening or a window opening or anything like that? Well, the window was open. I mean, you can tell after they stopped the car that the window was open. So you could have just pitched it out the window. You didn't have to open the door. But, again, it was Mr. Black that was making the furtive movements 20 seconds earlier, and he's the only one that was in the position to be able to throw the gun out. It would have been very difficult for the driver to have launched that over the top of the car. And why would he? Why wouldn't he throw it the other way if he wants to get rid of it? Mr. Black was the only one that could have put the gun where it ended up, on the side of the alleyway there. During the period other than the three seconds, I haven't had a chance to watch the video yet, but is it not possible that the gun was thrown out during the rest of the time because there was a clear view of the car and the passenger side? Well, they retraced the entire route of the car, and the only gun found was the one that was found where the left turn was made. No, no. I'm saying can we eliminate all but the three seconds because we would have seen the throw if it had happened other than during the three seconds, or is the angle such that it could have happened at other times? The only time the car is out of view of the squad video, and it's a pretty good squad video, is during that three seconds. You can watch that squad video, and you won't see anybody throwing a gun out during the first 20 seconds until it makes that left turn, and then it's out of view. And does the location of the three seconds match where the gun was found? Precisely. All right. So to accept the idea of the defense version of the facts, which came up for the first time in closing argument, the first time they ever claimed the gun wasn't in the car all along, you have to assume that somebody came along that day and just happened to place a gun in plain view by the garage, and it was just a coincidence that Black's car comes screaming by, has a collision right there, and it just so happens that he had a collision right where somebody else had deposited a gun for no apparent reason, and nobody had seen it that morning. That's not a reasonable inference. If that gun had been lying there for a long time, you would think someone would have seen it, would have reported it to the police. Nobody saw the gun until right after this police chase, and then a man came along who works there, found it, reported it to the police. I think this is what you're looking for, he said. So now we get back to the gun having had to have been in the car. Who threw it out? Couldn't have been the driver. His hands were on the wheel. Who else is in the car? Mr. Black. Who has a motive? Who's done this before? Who's been caught in cars before with guns? Mr. Black. Who said, I'm going to have a gun at all times because of this ongoing gang war? That was Mr. Black. As far as Mr. If there aren't any more questions about those issues, I'd like to deal with Mr. Ng's argument. He started off by saying that all e-mails are intercepted at the jail, so Mr. Bender knew that this one wouldn't get through. That's not true. That was not the evidence at all. In fact, one of these e-mails did get through. Only one of them was intercepted, and it was just by luck. Somebody happened to look down and saw the word green light and smash, and they thought that was significant. But it's not true that all e-mails are intercepted. In fact, Mr. Bender wanted that e-mail to get through. That's why when he dictated the e-mail to the female accomplice, he did it over a jail phone and used somebody else's PIN number so it couldn't be traced back to him. Because he knew this was going to get through. He knew it was illegal. He used somebody else's PIN number when he was dictating to the accomplice what to put in the e-mail. Judge Colleton, I think you hit it right on the head. This was not a threat case. This was a retaliation case, and so this First Amendment law doesn't really apply. Mr. Eng's client got the instruction he needed. The instruction was there has to be an intent to retaliate and an intent to inflict bodily harm. That's what the jury had to find. So this isn't a hypothetical situation like I had one time years ago. A defendant had been convicted, and he was mad at the people that testified against him, so he had some baseball caps made up with the slogan snitches get stitches. Well, that's more what Mr. Eng is talking about. That might be arguably protected speech, an opinion on whether people should cooperate with the government, and that might not be prosecutable under 1513, but this is much different. This isn't an opinion. This is directions to other people to beat up the witnesses in retaliation for testifying at a federal trial, and there's no First Amendment defense to that. Mr. Eng said, well, it was just an impulsive act by Mr. Bender. Well, no, it wasn't. There was planning that went into this. He had to get another inmate's PIN number to use to call up the accomplice, and he had to dictate to her what to say, and then the next day he had another conversation with her to make sure she'd done what he told her to do. This was not impulsive. This was planned, and it was only through good fortune that an alert staffer at the prison intercepted one of those e-mails and steps were then taken to protect the witnesses. It's only through good fortune that nothing did happen to them, but the plan was for them to be smashed, which means beat up, and it wasn't just one person supposed to do it. The e-mail said, tell everybody that these guys are snitches, and when you see them, you, being plural, once you've told everybody, then you smash them. It was going to be a mob action, but it was prevented, but it was not protected by the First Amendment. If there are no more questions about that, let me talk briefly about Mr. Johnson's sentencing.  I would think that you would be supportive of acknowledging early, if you don't want to, cooperation is sort of a term of art, but assistance with the police on this. It seems to me it's an argument that you both could have presented to the court in support of a slightly lower sentence for Mr. Johnson.  I haven't heard them accuse me of not giving a 5K where one was. No, no, I'm not talking about it. That's why I said cooperation is a term of art. I'm just talking about someone who's willing to plead early and turn over some information, and it seems like both parties have an incentive to encourage that. Okay. There's more to the story than what was said. Let me tell you what exactly happened with Mr. Johnson. I already told you that Mr. Johnson was the one who, on November 3rd, was sitting in a car and got shot five times by a rival gang member, and he did what they always do. When the police came, he said, I'm not telling you anything, and basically we know from past experience the reason they don't tell anything is because we'll handle it ourselves. That's what that whole list of shootings is all about in our addendum, and so Mr. Johnson would not cooperate with the police. We knew he was going to retaliate, so we got the indictment quickly, and when they went out to arrest Mr. Johnson, here's what he said. It's a good thing you came when you did. We were just about to go shoot up their houses. Oh, really? Yeah. I have a storage locker. I'll let you search it. You go to the storage locker, ATF does, and there's two AK-47-style assault weapons in there, a bunch of magazines, and some other guns, and Mr. Johnson, in the vernacular, said, we were about to go put K's through their walls. K's means AK-47, and walls means shooting up their houses. So that's Mr. Johnson's mentality. That's the basis for him getting a lower sentence. Well, here's what we did. Those guns in the storage locker had extended magazines. Probation wanted to tag Mr. Johnson with an enhancement for extended magazines, which would have doubled his guideline range. I said, no, don't do that. He took us to those guns. It wouldn't be fair. Wait, I don't understand that. You're saying that the guideline calculation was not based on the actual facts of the case? You just said ignore the magazines? I said it would not be fair under relevant conduct to enhance somebody's sentence based on guns that he provided when he was nominally cooperating. And I stand by that. What do you mean it wouldn't be fair? I mean, if you had an agreement under 1B1.8, then it wouldn't be. And there was no agreement at the time. But just in terms of fundamental fairness, I didn't think it was right to enhance his sentence by something he had done, which arguably helped the government. Well, if he'd made a confession, would you say it's not fair to use his confession against him? It depends on whether the confession was made while he was cooperating or not. Well, what does that mean? I mean, any confession is... Well, I mean, my policy is if someone comes in and gives a proffer and admits things, then I'm not going to use those things against him to get the sentence higher. Well, don't you have a proffer agreement that says that up ahead of time? Right. Did you have that with Johnson? It was a very informal thing because it came up on the day of arrest and there were calls to me back and forth. Did you inform the court about the magazines that were disregarded? Oh, yes. No, it was no... Everybody was in on it. Everybody was... Yeah, no, it was in the pre-sentence report. Probation was recommending the enhancement, and I'd already made a plea agreement that didn't include the enhancement, and I told the judge I want to stick by my plea agreement, and the judge said, well, I'll agree with you. But the point is Mr. Johnson did not... After that, he did not cooperate. And even on day one, it was only self-incriminating information. It wasn't... So you dispute the underlying representation that he was trying to assist at all? Well, I'll give him the benefit of the doubt. He was helpful on the day of his arrest. But nothing beyond that? No. I mean, we went to him many times to try to get him to testify against his co-defendants, and he said, I won't do it. And so there never was a basis for a 5K. But leniency was achieved because probation could have, and I guess Judge Colleton, maybe you think, should have... Well, you're saying it was the facts were the facts and it counted under the guidelines, and you're saying that you just asked the judge to disregard the guidelines, as I understand it.  I didn't ask the judge to disregard the guidelines. I asked the judge to adopt the guidelines that were set forth in my plea agreement. So I wanted him to honor the deal I'd made. But I understand you to be saying the deal you made disregarded the guidelines and the actual facts of the case. No. I don't agree with that. There was no hiding of these guns in the storage locker. There was just an agreement on my part not to hold him accountable for extended magazines since he was the one that led us to them. I just didn't think that would be fair. Well, I understand. I understand. At any rate, I started off on this by trying to say that... Your point was that he already got a break, in a sense, from not having those magazines counted. Exactly. Yeah, and therefore that's, in a sense, the sort of credit that he's saying he should have received for cooperating. Exactly. And that was one of my arguments in opposition to his motion for a variance. And counsel alleges procedural error, but Judge Kyle did deal with these motions. He actually asked Mr. Langling during the sentencing hearing, don't you want to argue your motion a little more? And so he knew the motion was there. There were four briefs back and forth on the motion. The judge did... I suppose another way to do it would have been to give him the enhancement and then argue for a variance. Could have done it that way. In fact, that was one of the... I proposed that in one of my briefs. I remember that now. I see. But so Mr. Langling says the judge's reasoning wasn't good enough, but if he thought so at the time, he should have asked for more explanation. He didn't. So you review for plain error. There is no plain error because although Judge Kyle's a man of few words, he did address every single issue. He addressed the cooperation issue. His words were something to the effect, well, I do think that he helped the government a little, but the government's not making a 5K motion and that's not challenged, so I'm not going to give a 5K to a variance because you're not supposed to. And he addressed the other motions as well. You mean you don't think he could have given a... I don't want to dwell on this anymore, but if he had received the enhancement from the magazines, you don't think the judge could have varied downward to offset that because it was a voluntary admission of something? That would be contrary to some law about the use of 5K1. Yeah, I would resist that because 5K1 is supposed to be triggered by a government motion and it's only supposed to be a benefit for cooperating against other people and not against yourself. Yeah. Well, except you're effectively doing that by not counting the adjustment, so I'm wondering if it could have been done the other way. But anyway, I'll ruminate on that. I had my plea agreement, so if he had varied on that ground, I wouldn't have appealed it. I would have gone along with it because I like to abide by my plea agreements. And in terms of the sentence being the same as Mr. Parker's, well, there was a good reason for that. They were quite literally partners in crime. They did their drug trafficking together. They had similar criminal histories. They were both Category 6. And even while they were both locked up at the Anoka County Jail, they both, as partners, engaged in strong-arming of fellow inmates, threatening them in order to get protection money from these fellow inmates. They did that together. And so, you know, when they're joined at the hip like that, it was not at all unreasonable for the judge to give them the same sentence of 78 months, which was a guideline sentence for both of them. I don't think I have anything to say about Mr. Parker other than what I've already said. It doesn't really seem to be challenging any procedural error. I think the sentence he got, based on his criminal history, being in Category 6, being a felon in possession of firearms, including carrying one at a gang funeral, fully justified that sentence. Unless there are other questions, I'll cede the balance of my time. Could I have just one question about the lack of an instruction on the use of the murder and shooting evidence? Was that ever raised by anyone? I understand the defense did not offer up a proposed jury instruction to instruct them on the limited use of it. Did that ever become part of the conversation during the jury instruction conferences? Not that I recall. But, again, there was the standard jury instruction that Black is not on trial for any act not alleged in the indictment. I thought I covered it fairly both in opening and closing. They certainly covered it in closing, pointing out that Mr. Black hadn't done any of the shooting. It wasn't disputed. I mean, this case was not about trying to accuse Mr. Black of being involved in shootings. It was about showing that he was a member of a gang that was involved in a gang war, which gave him a motive to have guns on all these different occasions when he was caught with guns. But it wasn't necessary, and we didn't try to point out who any particular shooter was. But when the motive for carrying guns is the existence of a gang war, and that's the whole theory of the indictment, then obviously the government's got to prove what it alleged. And so I made the choice to prove it, but prove it as narrowly and as ungraphically as possible. That's why there were no autopsy photos, there were no crime scene photos, there were no bloody corpses. There was nothing of that. It was very stripped down and paired so that this argument that's being now made is too prejudicial. We were hoping to avoid that. That's why we did it that way. When Johnson gave the information about the AK-47, that was information about what the gang was planning to do, right, when he took them to the storage lockers? He didn't name names, but he said, we were just about to go put K's through their walls. The we is his fellow gang members, obviously. So you could possibly think about that as giving information about the unlawful activity of others. I'm sorry? You could think about that as him giving information about the unlawful activity of others, couldn't you, even though it didn't amount to substantial assistance? I mean, it helped take off the streets some guns that were going to be used by others. So maybe what you did was sort of a retroactive 1B1.8. That's exactly what I was thinking at the time. I think I might have even cited that in one of my sentencing memos. You're just saying there hadn't been an agreement up front because it happened quickly with the ATF agents and the U.S. attorney wasn't involved yet, is that...? Well, I was involved, but it was the day of the arrest, a lot going on, 11 people getting arrested, I get a phone call, Jabari wants to take us to some guns, are you okay with that? Do it? Yeah, that's what it was. But again, there wasn't a basis for a 5K because when the time came, and I went to him more than once, trying to get him to be a witness, will you testify? No, I won't do it. Yeah, but you can give 1B1.8 protection to somebody even if it doesn't end up in a 5K motion.  Okay, thank you. Thank you. Mr. Paulson. Now we can have rebuttal. Mr. Zahid. Mr. Paulson used up 15 minutes addressing Mr. Black and I was only given 12 minutes. With the court's permission, if I have a couple more minutes, that would be great. First of all, Judge Carlton, the poll cam video is Government Exhibit 23. It's in our appendix. I'll watch it. Look at between 40 seconds and 1.35. People are milling about within 15 feet at that gun and nobody sees it. That's number one. Hold on, you mean before the car goes by? No, after the car goes by. So why is that significant? I mean, we know it was there. That is significant because they didn't notice the gun. The government says that the gun had to come from the car, but there's two individuals standing with it. So you're saying, well, if they didn't notice it at that point, then maybe people earlier in the day didn't notice it. All right, well, that's possible, but it's not obvious. With respect to the chase, I direct the court to the testimony of Bradley Head, transcript 306 to 311. He says the questioning is specifically on 309, which is in our appendix at 110. It says, and you didn't see the passenger at all. I may have seen a flash of him, but no, I didn't make eye contact, anything like that with him, no. And you didn't see a passenger door open. No, I did not. And you didn't see the passenger window open. Not at that time, no. So at the moment that Paulson, the government is talking about, when his hands are gripped on the wheel, as he's going by with that window open, this window was closed. Closed. Well, I thought the witness said, I didn't see that it was open. What did he say? Well, you could read the testimony, Your Honor. He said, you didn't see the passenger window open. Not at that point, no. So there's the other aspect. So your theory is that the window got rolled down after the accident occurred? No. My theory is that it was impossible. The government says that the gun was found there. When did the window get rolled down, then? We don't know. It's not the defense burden to prove the case. It's the government's burden to prove beyond reasonable doubt. Well, they proved the window was down when the car was stopped, right? When it was ordered stopped. Watch the video, Your Honor. At the end of it, there's a felony stop, and they're asked to raise their hands and roll down their windows. That's a different circumstance. But if you look at the time, the accident occurs here. Mr. Head testifies that he didn't see what happened after the car went behind him. The gun was found 15, 20 feet behind him. He doesn't know how the gun got there. Another testimony of Mr. Head. The government is trying to dissuade the idea that the driver took the gun and flipped it over. 305, do you think if the driver had thrown the gun with an arching movement over the roof of the vehicle, he would have seen that over my objection? I probably wouldn't have seen that because of where the gun landed at that moment and where I was hit. I didn't think I would have seen that. How far is it? How far of a distance is it? Between the garage, I would say at least 15, 20 feet, maybe a little more. The gun landed behind him. He has no clue how the gun there. The government cannot place it into the hands of Mr. Black. No one saw the gun thrown out. No one saw it in the car. The car wasn't registered to him. No fingerprints. No DNAs. As this court stated in Ramos, and I think this is apropos. I can't say it any better than this. We acknowledge the government presented evidence that Ramos tried to sell a different gun to Duran and admitted in the waiver form that he violated the condition of parole involving weapons. But neither of these facts ties Ramos to the particular gun that he was charged with possessing. Same is true here. Everything that Paulson, the government said leading up to the point, doesn't tie him to the gun that was found in the car. The gun found on the side of the road. That gun, nobody ever testified that Mr. Black ever possessed such a gun. It wasn't registered to him. Although the evidence may demonstrate that Ramos had access to a gun, as the government argues, it does not mean he had access to this gun or that he even knew about it. And though the firearm likely belonged to either Ramos or Schmidt or both, a conscientious mind would have to have entertained a reasonable doubt about whether Ramos constructively possessed it. A conscientious mind has to have that doubt, especially when the only person who saw anything at the moment of impact, and not when the gun was thrown out at all because the gun happened after that, saw both hands on the wheel and that window open. Thank you, Mr. Ceja. Thank you. I believe Mr. Did Mr. Ng have any time left? Okay. Time's up. I see you have notes this time. Well, number one, all the e-mails could have been intercepted. Everybody knew about the testimony before the e-mail was even sent. And so this whole idea that he could secure a threat or retaliation over somebody, over what was already known by everybody, changes the complexion of the case. I'd like to go on further, but I respect your time. I would request to reverse his conviction and take a hard look at his sentence as a result of that. All right. Thank you, Mr. Ng. Court wishes to thank all counsel for the defense for your presence and argument this morning. I understand you all are serving under appointment under the Criminal Justice Act. Court wishes to express to you our appreciation for your willingness to serve, and we trust the defendants do as well. We thank the government also for your presence in the argument and briefing submitted. We take the case under advisement and render decision in due course. Thank you.